## Morris I. Salter *vs.* Boston and Albany Railroad Company.

Suffolk.     December 6, 1920. — June 29, 1921.

Present: Rugg, C. J., Braley, De Courcy, Crosby, Pierce, Carroll, & Jenney, JJ.

*Damages,* For land taken under statutory authority. *Eminent Domain. Railroad. Easement. Way,* Private. *Evidence,* Remoteness.

At the trial of a petition for the assessment of damages resulting from the taking by a railroad corporation by eminent domain of a tract of land in the "rag district" in Chelsea, it appeared that on one side of the tract there was a private way which separated it from other land of the corporation used as a freight yard, that title of the abutting owners ran to the middle of the way, that owners of other lots upon a plan which included the tract of the petitioner and the land of the corporation had rights of passage over the way, that the petitioner's title to the middle of a part only of the way was taken, and that, after the taking, the petitioner had remaining only the title to the middle of the rest of the way and of other bounding private ways. The petitioner's evidence tended to show that the most profitable use for which the land taken was naturally adapted was the erection of a four-story brick building to be used for the storage and sorting of rags; that if such a building could be connected by a spur track or tracks with the respondent's freight yard on the opposite or northerly side of the way, there would be a substantial net annual saving in the charges that would otherwise have to be paid for trackage and handling; that as matter of construction a spur track or tracks could be laid from the freight yard across the way to the land in question without in themselves causing any obstruction to traffic over the way, and that the way for many years before the taking had been used by pedestrians and vehicles, especially by persons having business at the freight yard. The petitioner admitted that the way was a "travelled way" within the meaning of

St. 1906, c. 463, Part II, § 251. Several spur tracks were in existence across the private way in question and other private ways in the large tract subject to the same easements, and the corporation three years before the taking had signified its consent to a spur track to its freight yard being installed for the petitioner but a petition for permission so to do after a hearing had been placed on file by the board of aldermen of Chelsea. After the taking, the corporation closed the way through part of its length. *Held,* that

(1) It was proper, because of remoteness, to exclude evidence, offered by the petitioner on the issue of the probability or improbability that those having rights of passage in the way would oppose the laying of such a spur track by the petitioner, which tended to show that only three holders of such rights had objected to the closing by the corporation of the way in question after the taking and that the land they owned was on another way on the plan, that public notice of the taking had been published in newspapers and that no owners of such rights had made claims for damages within the time allowed by statute, that no consent of any owner of such rights ever had been obtained, that on no previous occasion of the laying of a spur track over the private ways on the plan had there been objection made, that, when the corporation signified to the petitioner three years before the taking its assent to the installation of a spur track, it made no suggestion that the consent of any one else would have to be procured, and that before the taking the city's board of aldermen had given consent under St. 1906, c. 463, Part II, § 251, to the laying of a spur track over another private way on the plan;

(2) Since the petitioner and the corporation before the taking owned the entire fee to the way subject to the easement of passage to which owners of other lots on the way were entitled, they had a right to make any use of that way which did not interfere with any reasonable use of the way by those entitled to the easement;

(3) The right to such use of the way by the petitioner and the respondent was not dependent upon consent by the owners of the easement;

(4) The petitioner was entitled to have the jury instructed that the construction and use by the corporation or by the petitioner of a spur track or tracks across the private way between their lands for the purpose of connecting the freight yard with the petitioner's land would not as a matter of law be a taking or a use of the easement of passage existing in favor of the owners of other lots on the plan;

(5) The purpose of the language of St. 1906, c. 463, Part II, § 251, was merely to declare and to apply to a particular situation the principle or doctrine that the right of eminent domain can be exercised only for a public and not for a private purpose;

(6) An instruction in the judge's charge, that the petitioner would have had no right to put a spur track across the way in question unless all those entitled to the easement of passage over the way would "consent — he and the railroad company would have no right, acting together, if they both agreed, they would have no right to put it across that street unless those other persons owning the right of way over . . . [it] gave their consent," was error;

(7) The petitioner was entitled to have the jury instructed in substance that the laying of the spur track across the way by the petitioner would not necessarily constitute an unlawful interference with the easement of passage above described, and that the determination of the question, whether it would do so, depended among other things upon the manner in which the tracks were laid;

(8) No one of those entitled to the easement of passage above described had

the exclusive right to use the way for passage, and no use of the easement of passage by any one of them, including the petitioner, could be deemed as a matter of law an invasion of the easement of passage of any other lot owner unless, considering all the circumstances, it was unreasonable;

(9) The petitioner was entitled to have the jury instructed that the laying of a spur track or tracks across the way in question to connect the petitioner's land with the freight yard would not be an invasion of the rights of the others entitled to the easement of passage above described, provided the tracks were so laid as not to constitute an appreciable or substantial obstruction to the passage of foot passengers and vehicles;

(10) The petitioner was entitled to have the jury instructed that, in determining to what extent, if at all, the use by the petitioner and the corporation of a spur track would have constituted an invasion of the easement of passage, the jury might consider whether or not the passage of freight cars, in such numbers and for such periods of time as the evidence showed would have been likely to occur had the petitioner's land been put to any advantageous use, would have constituted a substantial obstruction or interference with such use of the way as the other persons entitled to the easement of passage had a right to make;

(11) The petitioner was not entitled to have the jury instructed in substance that the owners of the easement of passage, if it be invaded, might or might not seek a remedy at law or in equity dependent upon particular circumstances;

(12) The petitioner's land did not adjoin land of the corporation upon which a private side track was constructed within the meaning of St. 1916, c. 137, § 1, or upon which one could be constructed without the consent of the board of aldermen of the city;

(13) The provisions of 36 U. S. Sts. at Large, 547, § 7, were not applicable to the facts recited above;

(14) Exceptions by the petitioner to refusals to give certain instructions as to the determination of damages were overruled because the judge charged the jury upon the special adaptability of the petitioner's land, not in the form requested, but in a manner which as a whole stated clearly and accurately the measure of value which was to be applied in the determination of the petitioner's damage;

(15) The petitioner was entitled to have the jury instructed in substance that, in assessing the petitioner's damages, they had a right to consider that by the taking there was left in the petitioner the ownership in fee simple of one half of some of the adjoining private ways subject to easements of passage in owners of other lots on the plan, which title was of no value excepting in connection with the land which had been taken.

PETITION, filed in the Superior Court on Ocotber 18, 1917, for the assessment by a jury of damages resulting from the taking by the respondent by eminent domain of land of the petitioner in Chelsea.

The action was tried before *Fessenden*, J. Material evidence and certain rulings of the trial judge as to evidence are described in the opinion. At the close of the evidence, the petitioner made twenty requests for rulings and instructions, and saved exceptions to the refusal of the judge to give all but those numbered

12 and 13. The ruling asked for in request numbered 4 was conditioned upon those asked for in requests numbered 1, 2 and 3 being refused, and the petitioner's exception to its refusal becomes immaterial since this court decides that requests numbered 1, 2 and 3 should have been given. Requests number 1, 2, 3, 5, 6, 7, 8, 10, 16 and 19 are described in the opinion. The remaining requests which were refused were as follows:

" 9. Even if (had this land not been taken) the construction and use of a spur track or tracks across Maple Street to connect the petitioner's land with the respondent's yard would have been likely to be of such a character as to constitute, or might have constituted, an invasion of the right of passage of the owners of other lots shown upon Shearer's plan, it does not necessarily follow that such invasion of right would have been ground for an injunction in equity. That would depend upon all the circumstances of the particular case, and the only redress to which any other lot owner or lot owners who might have seen fit to object would have been held to be entitled, might have been such money damages as measured the actual loss sustained by them."

" 11. In considering whether or not, had there been no taking, the petitioner's land could have been regarded as 'railroad land' in the sense in which that term has been used in this trial, namely, land capable of being advantageously connected by spur track or tracks with the respondent's yard, the jury may consider the provisions of St. 1916, c. 137, § 1, amending St. 1913, c. 784, § 25, and the following language thereof, to wit: 'The commission may, upon reasonable terms and conditions, require and order any railroad or railway company which carries freight in carload lots, to establish and maintain for the purposes of receiving or delivering freight in carload lots, a switch connection with any private side track constructed on land adjoining the location of any such railroad or railway, if the commission is of opinion that such connection is reasonable and practicable, can be put in and used with safety, and will furnish sufficient business to justify its construction and maintenance;' that is to say, the jury may consider this provision in the light of the other instructions of the court concerning the significance of St. 1906, c. 463, Part II, § 251, and the nature and limits of the right of passage of the owners of the other lots shown on Shearer's plan."

" 14. On the measure of damages, the court instructs the jury that the petitioner is entitled to recover the fair market value of his land on November 10, 1916, and that the market value of it was its value in view of all the purposes to which it was naturally adapted, which means that its market value, being vacant land, was fixed by its value for the most profitable of those purposes.

" 15. In determining the market value of the petitioner's land on November 10, 1916, the jury may consider the fact, if it be a fact, that this land was well adapted to the construction of a building for the carrying on of the rag business on a substantial scale."

" 17. On the measure of damages the court instructs the jury that the market value of land ' means the value for any and all uses to which the property is adapted and can readily be applied. If it is capable of being used in some particular way and has an enhanced value by reason of its availability for such use, the fact may be shown, and the value to be ascertained is the value thus enhanced; not because this is any other or greater value than the real market value of the property, but because it is the real value which is the subject of inquiry, and that value must depend much upon the nature of the property and its availability or adaptability for advantageous or profitable use.'

" 18. In determining the adaptability of the petitioner's land on November 10, 1916, for the erection of a building suitable for doing the rag business on a substantial scale, if the land was so adapted, the jury may consider the question to what extent the transaction of such rag business on said land would have resulted in economies or savings, either in teaming or otherwise."

" 20. In assessing the petitioner's damages the jury have a right to consider the fact, if it be a fact, that by the taking of the lot on Maple Street containing between twenty-eight thousand and twenty-nine thousand square feet there was left in the petitioner the ownership in fee simple of one half of Elm Street adjoining said land on the westerly side, and one half of Fourth Street adjoining said land on the easterly side, subject, of course, to easements of passage in owners of the other lots shown on Shearer's plan."

The jury found for the petitioner in the sum of $12,065.73; and the petitioner alleged exceptions.

The case was argued at the bar in December, 1920, before *Rugg*, C. J., *Braley*, *De Courcy*, *Crosby*, & *Pierce*, JJ., and afterwards was submitted on briefs to all the Justices.

*W. G. Thompson*, (*G. E. Mears* with him,) for the petitioner.

*R. A. Stewart*, (*C. O. Pengra* with him,) for the respondent.

PIERCE, J.  On November 10, 1916, the petitioner was the owner of a parcel of land in Chelsea, Massachusetts, bounded on the north by Maple Street, on the east by Fourth Street, on the south by private land, and on the west by Elm Street.  His title was in fee and it extended to the middle of the aforesaid streets. These streets were private, unaccepted ways, over which the petitioner and others, as owners of land shown on Shearer's plan of 1846, had in common an easement of passage.

On November 10, 1916, the respondent took the entire lot, not including one half of Fourth Street and Elm Street, under St. 1906, c. 463, "for the purposes of making or securing its railroad or for depot or station purposes or for one, or more new tracks adjacent to other land occupied by it by a track or tracks already in use in said Chelsea, which additional land is shown upon said plan of which Exhibit A is a copy."  It also took the northwesterly half of said Maple Street opposite the petitioner's land, and the northeasterly half of Elm Street from Maple Street to the Southeasterly line of lot 53, as shown on said plan, and the whole of said Elm Street from the last named line to the northwesterly end thereof.  The filing of said location under the decree of the Public Service Commission dated October 27, 1916, constituted a taking by right of eminent domain of all land therein described.  The petition to recover damages for the taking on November 10, 1916, was filed on October 18, 1917.  The defendant makes no objection to the form of the petition or to the jurisdiction of the court to try and determine the same.  The case was tried in the Superior Court to a jury in February and March, 1920, and resulted in a verdict for the petitioner.  It is before this court on eight exceptions of the petitioner to the exclusion of evidence, two to the admission of evidence, eighteen to the refusal to give rulings requested, and four to particular parts of the charge.

At the trial there was evidence that the petitioner was a member of a firm which had been engaged in carrying on in Chelsea for

many years on a substantial scale the business of buying, sorting
and selling woollen rags, with a place of business about a quarter
of a mile from the land taken. There was evidence that the land
taken, together with the freight yard, connecting tracks therein,
and freight station of the respondent lying opposite, were within
the district in Chelsea commonly known as the "rag district"
defined in an ordinance of the city of Chelsea. There was evi-
dence introduced by the respondent and disputed by the peti-
tioner, that in 1916 the lot taken was at the extreme end of said
"rag district," and that the centre of said "rag district" was
about a quarter of a mile distant from the lot taken. There was a
conflict of evidence to the effect that the most profitable purpose
of which it (the land taken) was naturally adapted was for the
erection of a four-story brick building to be used for the storage
and sorting of rags; but that if such a building could be connected
by a spur track or tracks with the respondent's freight yard on
the opposite or northerly side of Maple Street, there would be a
substantial net annual saving in the charges that would other-
wise have to be paid for trackage and handling; that the rags
to be sorted came from all parts of the country, mostly over the
respondent's railroad, in bales weighing from six hundred and
fifty to eleven hundred and fifty pounds, and were delivered at
the respondent's said yard on the opposite side of Maple Street;
that they were sorted by rag dealers, including the petitioner's
firm, into about one hundred different grades, and rebaled in
bales of about the same weight and shipped, almost entirely over
the respondent's railroad, from said yard to shoddy mills in New
England to be made up into cloth. There was also evidence that
if such a brick building were properly utilized for the rag business,
the business done there would require two freight cars into said
building and two freight cars out of the same per day. The re-
spondent introduced evidence that such rags sometimes came in
carload, and sometimes in less than carload, lots. There was evi-
dence that such a building would have to be built on piles, and
that the construction thereof would be expensive; but there was
evidence that such a building would be a reasonable and proper
building from an engineering and building standpoint. There
was also evidence that as matter of construction a spur track or
tracks could be laid from the respondent's freight yard across

Maple Street to the land in question, without in themselves caus-
ing any obstruction to traffic over Maple Street. There was evi-
dence that at the time of the taking and for many years prior
thereto, Maple Street opposite the lot taken had been used by
pedestrians and vehicles, especially by persons having business at
said freight yard.

There was evidence at the trial that a number of industrial
establishments in the district included on Shearer's plan were
connected with the respondent's railroad by spur tracks running
across one or another of the private streets shown on said plan;
and a few of these spur tracks, including one across Maple Street
easterly of Fourth Street, and between that street and the re-
spondent's main line of tracks, and another across Carter Street,
used by Lipsitz, had been in existence for some years before
November 10, 1916. It was admitted that shortly after the taking
the respondent closed the portion of Maple Street between its
freight, yard and the petitioner's land, and extended its eight
spur tracks and one new spur track across Maple Street, and
southerly across the petitioner's land; making, however, on the
extreme southerly side of the petitioner's land, a private street
or way running between Elm and Fourth streets, which private
street or way was forty feet wide and surfaced with stone block
paving; and also put in one new spur track on the portion of
Elm Street taken, raising the total capacity of the freight yard
from fifty-two cars to eighty-six cars, of which ten were on the
Elm Street track and the rest on the tracks as extended across
the petitioner's land.

It was admitted that on October 6, 1913, the petitioner's firm
filed with the board of aldermen of the city of Chelsea a petition
for permission to lay tracks across Maple Street from the Boston
and Albany railroad yards to the land in question. Upon this
petition the board of aldermen, on the recommendation of the
committee on streets, highways and bridges, voted to give the
petitioner a public hearing on November 10, 1913, and directed
its clerk "to give public notice of the same in the usual manner."
In pursuance of the order, a hearing was held on November 10,
1913. Max Levenson, attorney, and Mr. Salter appeared in
favor, and William Williams, Ike Kotzen, and John Harvey, the
owners respectively of certain parcels of land situated on Fourth

Street southeast of the lots taken, appeared in remonstrance "unless they could have equal rights in the road." The hearing was closed with an order that the Salter petition be referred back to the aforesaid committee. That committee recommended that this petition, in company with forty or fifty other petitions on various subjects, be placed on file; the report was accepted and adopted by the board of aldermen on June 28, 1915.

It was in evidence that at the time of the hearing the petitioner communicated to the respondent his desire for a spur track, and received from the railroad a blue print showing a proposed extension. There was evidence that no consent of the owner of any lot shown on Shearer's plan was asked or obtained, and no objection to the granting of the same was made by any person except the three persons who appeared in opposition to the granting of the same as above stated. There was evidence that after the hearing of the petition on November 10, 1913, there were negotiations between the petitioner's firm and the said Williams, Kotzen and Harvey, which, however, came to nothing. It was admitted that the petition was not subsequently to June 28, 1915, revived or pressed by the petitioner.

The petitioner admitted that on November 10, 1916, Maple Street between his land and the respondent's freight yard was a "travelled place" within the meaning of St. 1906, c. 463, Part II, § 251. At the trial the question of the interpretation and bearing of the following statutes was presented: St. 1906, c. 463, Part II, § 251, authorizing the construction of a railroad for private use and prohibiting the construction thereof over "a highway, town way or travelled place;" § 252 providing for the further regulation of such a crossing by the railroad commissioners, and the amendments thereto by St. 1912, c. 375, § 1; St. 1916, c. 137, § 1, amending St. 1913, c. 784, § 25, regulating the character and condition of railroads for private use in respect to switch connections; St. 1907, c. 585, §§ 5 and 6, and the provisions of U. S. Comp. Sts. (1918) § 8563, cl. 7, also relating to switch connections and cars to be furnished in connection with private side tracks and otherwise. As bearing on the probability or improbability that the owners of lots on the Shearer plan would have made any objection or sought in any way to enforce their rights if it be that the construction and use of a spur track would have been an invasion

of those rights, and for the purpose of showing the improbability that said owners would have withheld their affirmative consent to the laying and use of such a spur track if such consent was necessary under St. 1906, c. 463, Part II, § 251, the petitioner offered to prove by an employee in the respondent's legal department that no one of the owners of such lots after the respondent had taken by eminent domain the petitioner's land and had closed the portion of Maple Street between its freight yard and the petitioner's land, other than Samuel, Lipsitz, and Bloomfield who on November 10, 1916, owned land on the westerly side of Elm Street opposite the respondent's freight yard, ever made any claim upon the respondent as the result of the taking. The presiding judge rejected the proffered evidence; we assume on the ground that proof that one has acted or has refused to act on one occasion, is not relevant to prove that that person will again act in a like manner under similar conditions; much less that he will act in the same way under conditions which differ in substantial particulars.

In this connection, as bearing upon the probability of the owners of land on the Shearer plan consenting to the use of a spur track on Maple Street, the petitioner offered in evidence newspapers which published notice of the proposed taking of November 10, 1916, to prove that such owners had notice of the proposed taking, and then to prove that no one of such owners had ever made any claim, although the time for making claim had expired. For a like purpose the petitioner offered to prove that no consent of any owner of said other lots had ever been obtained, and no objection had ever been made by any of said owners when prior to this taking other spur tracks had been laid across other private streets shown on the plan, and also across Maple Street. For a like purpose the petitioner offered to prove that when the respondent sent him in 1913 a plan of the proposed spur track, it never made any suggestion that it would be necessary to get the consent of anybody else. The petitioner also offered to prove that prior to November, 1916, the board of aldermen gave its consent under St. 1906, c. 463, Part II, § 251, to one Levine to lay a spur track across another private street on Shearer's plan, Carter Street. The exclusion of the above proffered evidence was legally justifiable, as it was at most only remotely relevant as proof that the owners of land would probably give their consent

to the petitioner to construct and use a spur track across Maple
Street.

At the close of the evidence, and before the arguments, the
petitioner, referring to the following language in St. 1906, c. 463,
Part II, § 251, to wit: "A person or corporation may construct
a railroad for private use in the transportation of freight; but
shall not take or use lands or other property therefor without the
consent of the owner thereof," requested the judge to instruct
the jury:

" 1. . . . that so far as § 251 is concerned, it would not have
been necessary to obtain the consent of any of the persons who,
under the stipulation on file in this case, had an 'easement of pas-
sage' along or across Maple Street."

" 2. . . . that the construction and use by the respondent or
the petitioner of a spur track or tracks across Maple Street for
the purpose of connecting the respondent's yard with the peti-
tioner's land on the southeasterly side thereof, would not be a
taking or a use of the easement of passage on Maple Street exist-
ing in favor of the owners of lots on Shearer's plan other than the
lots of the petitioner and the respondent."

" 3. . . . that the purpose of said [quoted] language was merely
to declare and to apply to a particular situation the principle or
doctrine that the right of eminent domain can be exercised only
for a public and not for a private purpose."

The judge refused these requests, and in the charge dealt with
the subject matter of them in these words: "Something has been
said about the railroad company and the joining together and
putting a track across Maple Street on to his land. I shall have
occasion in a very few minutes to speak of this matter more in
detail. But it is sufficient for our purposes to know now that
he had no right to put a railroad track across that street, he had
no right to do it, no legal right to do it, because you see it would
interfere with the rights of other people on the street there. He
would have no right to do that unless they would all consent — he
and the railroad company would have no right, acting together,
if they both agreed, they would have no right to put it across that
street unless those other persons owning the right of way over
Maple Street gave their consent. I mean, they had no right to
do such a thing as that, the petitioner had no right to do such a.

thing as that, no legal right; neither did the railroad company have any legal right to do it of its own motion; neither had they together the right to do it. So that if that was all there was to it, you would assume there was no right to run the railroad track across that street."

We think the requests for rulings should have been given. The petitioner and the respondent owned the fee of the private way called Maple Street, subject to an easement of passage in the owners of land shown on Shearer's plan. Aside from the statute which requires the consent of the board of aldermen, and in certain contingencies that of the railroad commissioners, the owners of the fee could use that fee in any way such an interest in land can legally be used, provided such use did not interfere with any reasonable use as distinguished from any theoretical use of the owner of the easement. It follows that the owner of a mere easement of passage has no legal or equitable right to give or withhold consent to any use of the fee, which does not interrupt the reasonable use and enjoyment of the dominant estate. It is plain the board of aldermen, and in a proper case the railroad commissioners, are not restrained nor constrained to withhold consent, under the statute, to the construction of a private railroad across a highway, town way or travelled place by the refusal of persons having a right of passage over such ways to consent thereto. The legal and equitable rights of the owners of easements in ways of passage are fully protected at law and in equity, if the use by the owner in fee, with the consent of the aldermen or commissioners, injuriously affects the enjoyment of the easement. For the reason above stated, we think the requests numbered 1, 2 and 3 should have been given in substance, and that the charge that "He would have no right to do that unless they would all consent — he and the railroad company would have no right, acting together, if they both agreed, they would have no right to put it across that street unless those other persons owning the right of way over Maple Street gave their consent," was error.

Basing his requests upon the evidence that a track or tracks could be laid across Maple Street without obstruction to traffic, the petitioner asked for and the judge refused the following rulings or instructions:

"5. . . . that so far as the owners of lots shown on Shearer's

plan other than the lots belonging to the petitioner and the respondent are concerned, had this taking not occurred, it would not necessarily follow that the mere laying of a track or tracks across Maple Street for the purpose of connecting the petitioner's land with the respondent's yard would be an illegal interference with the easement of passage belonging to such other persons. Whether or not such laying of tracks, as distinguished from the subsequent use of the same for cars, would constitute an invasion of the rights of such other lot-owners, would depend, among other things, upon the manner in which said tracks were laid in Maple Street.

"6. The easement of passage referred to in the first paragraph of the 'Statement of Part of the Facts' on file in this case as belonging to the owners of lots shown on Shearer's plan, was the right to use said Maple Street for the purpose of passage on foot or with vehicles; but was subject to the qualification that such use by any one individual should be a reasonable use, that is, consistent with a similar reasonable use on the part of every other person having such easement of passage. No one of said lot owners had the exclusive right to use Maple Street for passage, and no use of the easement of passage by any one of said lot owners, including the petitioner, could be deemed as a matter of law an invasion of the easement of passage of any other lot owner, unless it was unreasonable considering all the circumstances.

"7. . . . that the laying of a spur track or tracks across Maple Street to connect the petitioner's land with the respondent's yard, would not be an invasion of the rights of the owners of other lots shown on Shearer's plan, provided the tracks were so laid as not to constitute an appreciable or substantial obstruction to the passage of foot passengers and vehicles.

"8. In determining . . . to what extent, if at all, the use by the petitioner and the respondent of a spur track . . . would have constituted an invasion of the easement of passage . . . the jury may consider whether or not the passage of freight cars in such numbers and for such periods of time as the evidence in this case shows would have been likely to occur had the petitioner's land been put to any advantageous use, either by erecting a building thereon for the conduct of the rag business, or other-

wise, would have constituted a substantial obstruction or inter-
ference with such use of Maple Street as said other lot owners
had a right to make."

These requests numbered 5, 6, 7 and 8, if granted, in substance ·
would have instructed the jury in accordance with the law that
the owner of land which is subject to an easement of passage and
an owner of an easement of use have the right to make any use
of the servient land that is not inconsistent with the easement
and with the enjoyment of the easement by other owners. *Atkins*
v. *Bordman,* 2 Met. 457, 467. *Appleton* v. *Fullerton,* 1 Gray, 186.
*The King* v. *Jolliffe,* 2 T. R. 90. *Clifford* v. *Hoare,* L. R. 9 C. P.
362. Goddard on Easements (7th ed.), 6. *Crocker* v. *Cotting,* 181
Mass. 146, 151. *Duncan* v. *Goldthwait,* 216 Mass. 402.

We do not think there was error in the refusal of the judge, in
response to request number 9, to instruct the jury in substance
that the owners of the right if it be invaded might or might not
seek a remedy at law or in equity dependent upon particular
circumstances.

In substance the jury were instructed in accordance with the
petitioner's requests numbered 10, 16 and 19. These requests pre-
sent the situation of the possible invasion of the rights of passage
by the construction or use of the proposed spur track or tracks,
with the suggestion that the invasion might be such that there
would be no reasonable probability of the owners of the dominant
estate objecting thereto, or interfering therewith. In this regard
the jury were instructed as follows: "I have spoken about this
land, for what purposes it is adapted, how it shall be used. In
passing upon that question, I think I should say to you, gentle-
men, that you may take into account this: The likelihood, the
· probability or what not of the persons interested, owning these
rights of way, enjoying the right of way over Maple Street, their
giving their consent, the likelihood of their giving their consent
to the use of the property in the way it is claimed. That may be
taken into account by you in estimating the fair value on that
day, the 10th of· November, 1916, of this land; but I don't want
you to understand I in any way change what I said, that there
was no legal right" (in the petitioner or respondent to put a
railroad track across the street without that consent).

Request number 11 was refused rightly; the petitioner's land

did not adjoin the location of the respondent's land within the meaning of St. 1916, c. 137, § 1, upon which a private side track was constructed, or upon which one could be constructed without the consent of the board of aldermen. St. 1906, c. 463, Part II, § 251. The provisions of U. S. Comp. Sts. (1918), § 8563, cl. 7, are not applicable to the facts disclosed by the record.

We perceive no error in the refusal to give the requests numbered 14, 15, 17 and 18. The judge charged the jury upon the special adaptability of the petitioner's land, not in the form requested, but in a manner which as a whole stated clearly and accurately the measure of value which was to be applied in the determination of the petitioner's damage.

The request of the petitioner numbered 20 should have been given in substance. By the taking the petitioner was left with the title in fee to one half the land adjoining the lot taken, known as Elm and Fourth streets. This land could not be used except in connection with the land taken; but with that land could have been found to have had a substantial value.

A majority of the court are of opinion the exceptions should be sustained.

*Exceptions sustained.*